UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CASE NO. 21-cr-665-TNM |
| : | |
| CHRISTOPHER HAM, : | |
|     Defendant. : | |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this memorandum to aid the court in sentencing the defendant, Christopher Ham. The United States requests a sentence of 168 months of incarceration, followed by a lifetime of supervised release. The government is also seeking restitution in the amount of $100,000 on behalf of the minor victim in this case. This proposal provides for a just sentence that balances the factors outlined in 18 U.S.C. § 3553(a).

**I.    Background**

Before the age of 10 – during her most formative years – Minor Victim 1 was subjected to recurrent and degrading sexual abuse at the hands of her mother. Rather than protecting and caring for her daughter, this separately charged defendant allowed three different men, including the defendant, to sexually abuse the little girl while she filmed it. Minor Victim 1 was further exploited when images and videos depicting her sexual abuse were uploaded to a cloud storage account and distributed to other offenders, permanently memorializing the horrific way in which the child was betrayed and offered up for the sexual gratification of others.

In April of 2020, Minor Victim 1 was removed from the home of her abusive mother, hereinafter DEFENDANT 1. Law enforcement received a tip that DEFENDANT 1 distributed sexually exploitive images of the little girl, including images depicting the incestuous abuse of the

child by DEFENDANT 1. As part of the investigation, law enforcement seized multiple electronic devices from the home and arrested DEFENDANT 1. As the investigation continued, law enforcement recovered numerous images depicting the sexual abuse of children, including the Minor Victim 1, from DEFENDANT 1's cellular phone and from her Dropbox account.

The defendant's sexual abuse of Minor Victim 1 was first discovered when law enforcement viewed it in one of the videos recovered from DEFENDANT 1's Dropbox account. The video, which is 38-seconds long, shows the defendant placing his tongue on little girl's bare vulva, as the pre-pubescent child lay motionless, apparently asleep. The child's genitals and anus are prominently displayed for the camera as the defendant continues to abuse the child for the duration of the video. The downward angle of the camera suggests that the person filming the abuse – later determined to be DEFENDANT 1 – is holding the camera immediately above the defendant's head while recording. While the exact date the video was created is uncertain, it is believed to have been uploaded to Dropbox on October 14, 2019. At that time the video was uploaded, Minor Victim 1 would have been just eight years old.

The defendant's sexual abuse of Minor Victim 1, while facilitated by DEFENDANT 1, was not merely a crime of opportunity. Rather, the chats between the defendant and DEFENDANT 1 show that the defendant's sexual interest in this vulnerable little girl steadily progressed during the course of his relationship with DEFENDANT 1. This all led to the defendant's decision to travel from his home in Maryland to Washington D.C. in order to engage in sex acts with the little girl.[1]

---

[1] Although the defendant admitted that these facts were true as part of the plea agreement in the instant case and during the Change of Plea Hearing, he now appears to dispute these assertions by claiming that "in order to deflect responsibility from herself, Defendant 1 lied to law enforcement about him expressing interest in children prior to the instant offense." Flower, Travis D., *Psychosexual Evaluation and Risk Assessment*, March 25, 2022, at 10. The Court has been provided a copy of this evaluation. It is not being filed with this Sentencing Memorandum due to the sensitivity of the information contained therein.

2

DEFENDANT 1, who has participated in multiple interviews with law enforcement, disclosed that she initially met the defendant via the internet, before beginning a sexual relationship with him.  During their relationship, the defendant expressed a sexual interest in children and told DEFENDANT 1 that he thought about Minor Victim 1 when he engaged in sex acts with DEFENDANT 1.  In fact, DEFENDANT 1 and the defendant engaged in sex acts with the little girl in the same room with them, a scenario that the defendant told DEFENDANT 1 excited him.  As detailed above, this excitement was acted upon by the defendant, who sexually abused the child while DEFENDANT 1 filmed it.

The defendant's deviant interest in Minor Victim 1 did not end with the abuse for which he has been charged.  Even after engaging in sexual acts with the child, he demonstrated an ongoing sexual interest in her.  As recently as April 6, 2020, less than a month before DEFENDANT 1 was arrested, the defendant exchanged Facebook messages with DEFENDANT 1, specifically asking whether she and the child had engaged in "any new sexual adventures lately."

The defendant was arrested on April 6, 2021, after being identified as the adult male in the video described above, which was recorded in DEFENDANT 1's apartment.  On December 14, 2021, the defendant entered a plea of guilty to a two-count information, including one count of Travel with Intent to Engage in Illicit Sexual Conduct, in violation of 18 U.S.C. § 2423(b), and one count of First Degree Child Sexual Abuse with Aggravating Circumstances, in violation of 22 D.C Code Section 3008, 3020(a)(1), 3020(a)(4).  *See* Presentence Investigation Report ¶ 4.  As part of the plea agreement, the United States agreed to cap its sentencing allocution at 168 months of incarceration, the bottom of the defendant's agreed-upon Sentencing Guideline's range for these offenses.  This case is set for sentencing on May 16, 2022.

**II.      A Sentence of 168 Months Accurately Reflects the § 3553(a) Factors**

In determining a reasonable sentence, the Court must consider the factors listed in 18 U.S.C. § 3553(a).[2] These factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed –
   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B) to afford adequate deterrence to criminal conduct;
   (C) to protect the public from further crimes of the defendant; and
   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and
(3) the kinds of sentences available;
(4) the applicable sentencing guidelines range for the offense;
(5) pertinent policy statements issued by the U.S. Sentencing Commission;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *see also United States v. Pyles*, No. CR 14-00006 (RJL), 2020 WL 376787, at *2 (D.D.C. Jan. 23, 2020); *United States v. Mitchell*, No. CR 05-00110 (EGS), 2019 WL 2647571, at *7 (D.D.C. June 27, 2019). A district court, however, "need not consider every § 3553(a) factor in every case." *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008); *see also United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017).

   A.  **The Nature and Circumstances of the Offense**

The defendant's sexual abuse of a sleeping child – which was recorded on video and distributed electronically – is among the most serious crimes against children, leading to lasting and often devastating consequences for victims. Studies suggest that early trauma, including

---

[2] "Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), the Guidelines serve only an advisory function. *Id.* at 245, 125 S. Ct. 738. Nevertheless, even in a post-*Booker* world in which the Guidelines are not binding, the sentencing court 'must calculate and consider the applicable Guidelines range" as its starting point. And *Booker* did not change "how the Guidelines range is to be calculated." *United States v. Mattea*, 895 F.3d 762, 766 (D.C. Cir. 2018) (internal citations and quotations omitted).

sexual abuse, may interfere with brain development, and can produce various neuropsychiatric symptoms commonly associated with drug use. *See* Anderson, C. M., Teicher, M. H., Polcari, A., & Renshaw, P. F. (2002): Abnormal T2 relaxation time in the cerebellar vermis of adults sexually abused in childhood: Potential role of the vermis in stress-enhanced risk for drug abuse. *Psychoneuroendocrinology, 27*, 231-244; Baynard, V. L., Williams, L. M., & Siegel, J. A. (2001): The long-term mental health consequences of child sexual abuse: An exploratory study of the impact of multiple traumas in a sample of women. *Journal of Traumatic Stress, 14*(4), 697-715 (noting that child sexual abuse victims reported a lifetime history of more exposure to various traumas and higher levels of mental health symptoms). Other studies have found that individuals who suffer sexual abuse in their childhood years have a higher rate of anxiety, disruptive behaviors, substance abuse, and personality disorders compared to others who may have experienced other forms of abuse or neglect. *See* Cohen, P., Brown, J., & Smailes, E. (2001): Child abuse and neglect and the development of mental disorders in the general population. *Development and Psychopathology, 13*, 981-999; Dube, S. R., Anda, R. F., Felitti, V. J., Chapman, D. P., Williamson, D. F., & Giles, W.H.(2001): Childhood abuse, household dysfunction, and the risk of attempted suicide throughout the life span: Findings from the adverse childhood experiences study. *JAMA, 286*(24), 3089-3096 (noting that a powerful relationship exists between adverse childhood experiences and risk of attempted suicide through the life span); Merrill, L. L., Thomsen, C. J., Sinclair, B. B., Gold, S. R., & Milner, J. S. (2001): Predicting the impact of child sexual abuse on women: The role of abuse severity, parental support, and coping strategies. *Journal of Consulting and Clinical Psychology, 69*(6), 992-1006 (child sexual abuse is a significant predictor of long-term psychological difficulties ranging from depression and anxiety to sexual problems and dissociative symptomatology). Research also indicates that sexually

5

abused adolescents are at an increased arrest rate for sex crimes and prostitution, and are at an increased risk for earlier pregnancy. *See* Putnam, F. W. (2003): Ten-year research update review: Child sexual abuse. *Journal of the American Academy of Child and Adolescent Psychiatry, 42*(3).

Child sexual abuse is a "crime of violence," in the District of Columbia, even where it does not include physical force or threats, reflecting the reality that many childhood sexual abuse victims experience the same long-term trauma as victims of other types of violence, even when their bodies do not bear any visible scars. D.C. Code § 23-1331(4). While the full extent of the damage suffered by Minor Victim 1 is not known at this stage of her young life, it is undisputed that she is likely to suffer the consequences of the defendant's sexual abuse for years to come.[3] *See generally,* Tabron, Dr. Abyssinia, Restitution Review and Report, July 27, 2021 (filed separately and under seal). The absence of visible injury does not mean that the defendant did not cause long-term damage.

> Sexual victimization, such as [Minor Victim 1] was subjected to, is an adverse childhood experience that will have effects not limited to effects on [Minor Victim 1's] emotional wellbeing during childhood. This type of injury has the potential for impacting her global sphere of functioning and how she relates to herself and others for many years to come.

*Id.* at 10. As Dr. Abyssinia noted, it may take Minor Victim 1 upwards of 15 years of psychotherapy and related services to address the residual impact of childhood sexual abuse. *Id.* at 13-18. These potential injuries include a host of both mental and physical ailments that frequently attend childhood sexual abuse, including dissociation, increased risks of alcoholism, drug abuse, depression, suicide attempts, smoking, an increase in sexual partners and sexually

---

[3] The defendant himself acknowledged that his offense traumatized the child victim, saying "I don't think she's going to be able to have a normal life." Flower, Travis D., Psychosexual Evaluation and Risk Assessment, March 25, 2022, at 7.

6

transmitted diseases, and sever obesity. *Id.* at 8-10.  Further, adverse childhood events, including sexual abuse, are interrelated with serious health conditions later in adulthood, including "ischemic heart disease, cancer, chronic lung disease, skeletal fractures, and liver disease." *Id.* at 10.  As such, the defendant contributed to putting this little girl on a lifelong course of facing down numerous mental health and physical challenges.

Additionally, survivors of childhood sexual abuse often experience intense feelings of guilt and shame that can affect their capacity to develop meaningful present and future relationships and can result in more guarded and cautious interactions with peers and other adults. *See* Raymond E. Webster, Symptoms and Long-Term Outcomes for Children Who Have Been Sexually Assaulted, 38 Psych. in the Schools 533, 536–39 (2001). These children often develop symptoms associated with post-traumatic stress disorder (PTSD), including general agitation, behavior disorganization, and frightening nightmares. *Id.* at 537. Children who are particularly young or rely on the perpetrator for things like emotional support can suffer particularly severe trauma that intensifies their fears, causes emotional confusion, and impedes their ability to trust others. *See id.* at 538–39.

Although family support and parental understanding can mitigate some of these long-term issues, the trauma of abuse can also "overwhelm" even "an essentially healthy functioning child who resides in a reasonably well-functioning home because [it] can disrupt the primary protective factors (such as friends, caretakers, extended family, familiar neighborhood) that protected the child initially." Webster, Symptoms and Long-Term Outcomes, at 540.  This is particularly acute here where Minor Victim 1 lived in an abusive environment with her mother for the majority of her life, and then had to transition to living with her father, who she had previously only visited on weekends.  The transition, as described by Minor Victim 1's father

in his Victim Impact Statement, filed separately under seal, has been incredible difficult for Minor Victim 1 and her family. For all of these reasons, a guidelines sentence of 168 months of incarceration, followed by lifetime supervised release, will reflect the gravity of the defendant's conduct and the long-term harm that he has caused to a defenseless little girl.

### B. History and Characteristics of the Defendant

At first glance, the defendant's background, including his educational accomplishments, employment history, and the fact that he has no prior contacts with law enforcement suggest that he is someone who is generally law abiding and disposed to contributing to society. Nevertheless, his willingness to seek satisfaction of his sexual predilections to the point of engaging in the criminal sexual abuse of a child demonstrates that sexual gratification is a higher priority to him than obeying the law.

It should be noted that the defendant's lack of criminal history was accounted for when determining the applicable Guidelines range. Therefore, it should not serve as a reason to vary from a Guidelines sentence. Furthermore, as this Court is well-aware, the online sexual exploitation of children, as well as the hands-on sexual abuse of children, is a crime that is committed in secret. This secrecy, combined with the overwhelming presence of digital devices and the near universal access to the internet, makes detection of these criminal offenses difficult. In the present case, the Defendant abused this vulnerable little girl and was able to "get away with it" for over two years before he was caught by law enforcement. When fashioning the appropriate sentence in a child exploitation offense, the absence of an arrest record should be viewed with caution, because it is well-known that children often do not disclose sexual abuse, and that these types of crimes are wildly underreported. *See United States v. Gregory Todd Numan*, 3:160cr000065(TMB)(DAK)(February 26, 2018: Expert Testimony of Clinical Psychologist

Darrell Turner). In *Numan*, Dr. Turner provided expert testimony to the Court to explain why a reliance on the lack of prior criminal history of an offender charged with sexual offenses committed against children does not serve as a reliable indicator of their future risk for reoffending. As explained by Dr. Turner:

> "One of the main problems is the fact that these offenses are among the most undetected offenses that there are. This is not like bank robbery or murder, where it's generally assumed and expected that it's going to be detected and reported. We know from research that about only about five percent of sexual offenses against children are ever reported.
>
> Of those, of that five percent, about another five percent result in a conviction. So we're talking about an exponentially small number of offenses that are reported and accounted for.
>
> So it's sort of akin to saying there were only four drunk people in New Orleans in Mardi Gras this year because there were only four arrests for public intoxication, and it's not a good representation of what's actually going on out there. So to say it without the qualifier that, hey, this is a gross underestimate, but you know, so far, this is what we've been able to find, I think, is misleading and very, very dangerous."

at pages 22-23. *See also* K. London, M. Bruck, S. J. Ceci & D. W. Shuman, *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways Children Tell?*, 11 PSYCHOLOGY, PUB. POL'Y & L. 1, 194-226 (American Psychological Association, 2005)(finding in a study of adult retrospective victim studies about child sex abuse, approximately 60 – 70% of adults sexually abused as children did not recall disclosing the abuse during childhood); *See also* D. W. Smith, E. J. Letourneau, B. E. Saunders, D. G. Kilkpatrick, H. S. Resnick & C. L. Best, *Delay in Disclosure of Childhood Rape: Results from a National Survey*, 24 CHILD ABUSE & NEGLECT 2, 273-87 (2000)(the results of the study found that only 12]% of child rape victims' assaults were reported to law enforcement authorities.). As such, the fact that the Defendant lacks a criminal record, given the ways in which these types of crimes are committed and the reluctance and

inability of the victims to disclose, should be given less weight by the Court when determining the appropriate sentence, given the nature of the offense he is pleading guilty to.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense

This factor is known as the "just desserts" concept, answering the need for retribution so that the punishment fits the crime and the defendant is punished justly. *See United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010). The *Irey* court cited the Senate Report regarding this provision:

> This purpose--essentially the "just desserts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

*Id.*

As described above, the sexual abuse and exploitation of children are offenses that have lifelong, devastating consequences for the victims. With respect to 18 U.S.C. § 3553(a)(2)(A), a Guidelines sentence of 168 months would provide "just punishment" for his offenses, promote respect for child sexual abuse and exploitation laws, and reflect the seriousness of his offenses and offenses against minor victims in general.

### D. The Need for the Sentence Imposed to Afford Adequate Deterrence

"Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor." *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007). Congress, the Supreme Court, and the Sentencing Commission have demonstrated that general deterrence is a very important factor when considering an appropriate sentence. *See United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017) (the sentence would deter Fry and "others who may be inclined in doing similar kinds of things."); *see also United States v. Ferber*,

458 U.S. 747, 760 (1982).  A sentence of 168 months is a lengthy, but just, sentence that would support Congress's aim of generally deterring the sexual abuse and exploitation of other children. Such a sentence demonstrates that federal courts take child sexual abuse and exploitation seriously and that offenders will be held to account for the long-term damage that they cause to their vulnerable victims.

### E. The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant

A significant sentence is necessary to protect the public, including other children, from future crimes committed by this defendant.  Following a psychosexual evaluation, Dr. Flower concluded that the defendant falls within the "Below Average" risk categories after administering two instruments.  *See* Flower, Travis D., *Psychosexual Evaluation and Risk Assessment*, March 25, 2022, at 8-9.  However, Dr. Flower also noted that the defendant possesses certain factors that increase his risk for reoffending, including:  deviant sexual interests; evidence of a psychosexual disorder; sexual preoccupation; and the use of sex as a coping mechanism.  *Id.* at 9-11.  While a term of imprisonment may not eliminate the existing risk factors, the longer the sentence and the older this offender is at the time of his release will serve to decrease the likelihood that he reoffends.  *Id.* at 12.

As a general matter, sex offenders have a high rate of recidivism.  *See Lombard v. United States*, 44 F. Supp. 3d 14, 26 (D.D.C. 2014) (noting that the lower court's concerns about recidivism was supported by substantial authority (citing *Smith v. Doe,* 538 U.S. 84, 103, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) ("The risk of recidivism posed by sex offenders is frightening and high.") (citations omitted); *McKune v. Lile,* 536 U.S. 24, 33, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (noting that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual

11

assault"); *United States v. Irey,* 612 F.3d 1160, 1214 (11th Cir.2010) ("[T]he threat of recidivism by a pedophile who has sexually abused a child is appalling.") (citation and quotation marks omitted); *United States v. Allison,* 447 F.3d 402, 405–06 (5th Cir.2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders."). Given all of the above, a sentence within the guidelines range takes into account Dr. Flower's assessment, this defendant's ongoing risk factors, and the overall high rate of recidivism for sex offender. As such, a sentence of 168 months is necessary to protect the public from future crimes committed by this defendant.

### III. The Child Victim is Entitled to Restitution

Restitution is mandatory for offenses involving travel with intent to engage in illicit sexual conduct, in violation of Title 18 U.S.C. § 2423(b), one of the two offenses to which the defendant has pled guilty. *See* 18 U.S.C. § 2429(a). Under the statute, the order of restitution "shall direct the defendant to pay the victim…the full amount of the victim's losses." § 2429(b)(1). The "full amount of the victim's losses" caries the same meaning as in § 2259(b)(3), which includes any costs incurred by the victim for:

> (A) Medical services relating to physical, psychiatric, or psychological care;
> (B) Physical and occupational therapy or rehabilitation;
> (C) Necessary transportation, temporary housing, and child care expenses;
> (D) Lost income;
> (E) Attorneys' fees, as well as other costs incurred; and
> (F) Any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(a), (b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015).

Here, the offense of conviction falls squarely under the mandatory restitution requirement of § 2429, and the court "shall" direct the defendant to pay the full amount of Minor Victim 1's losses. To assist the court in determining the restitution amount, the Court has been provided the

Restitution Review and Report, prepared by Dr. Abysinnia Tabron on July 27, 2021, which was filed separately under seal. This report itemizes the expected losses that Minor Victim 1 will face over the course of her lifetime. *See* Tabron, Dr. Abysinnia, Restitution Review and Report, July 27, 2021, at pp. 13-18. This report details the expected costs that this little girl is expected to incur in order to address the sexual abuse that was perpetrated by the defendant and others in both the short and long term. Dr. Tabron calculated a total loss amount of $1,406,380. *Id.* at 13-18. After a review of this report, the United States requests this Court to order restitution in the amount of $100,000, a small fraction of the overall losses that Minor Victim 1 is expected to face over her lifetime.

The case of *Paroline v. United States*, 572 U.S. 434 (2014), can provide the Court some guidance in fashioning a restitution award. In *Paroline*, the United States Supreme Court faced a circuit split over the interpretation of 18 U.S.C. § 2259, specifically over "how to determine the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed." *Paroline*, 572 U.S. at 439. In that case, the defendant possessed two images of the victim who was seeking restitution. The Court's answer to this question involved three steps.

First, *Paroline* held that, because the statute defined a "victim" as someone "harmed as a result" of the offense, restitution under § 2259 was proper "only to the extent the defendant's offense proximately caused a victim's losses." *Id*. at 448. Second, the Court held that "proximate cause" under § 2259 did not require strict but-for causation. *Id*. at 458-59. Third, the Court provided sentencing courts the following guidance for how to determine the proper amount of restitution under this standard. *Id*. The Court noted that a sentencing court's goal should be to assess "the significance of the individual defendant's conduct in light of the broader causal process

that produced the victim's losses," taking into account any "available evidence." *Id*. at 459-60. The Court emphasized that there is no "precise mathematical inquiry" governing this determination and that district courts must exercise "discretion and sound judgment" in fashioning restitution awards. *Id*. The Court suggested several factors to be considered, including: (1) the number of defendants convicted of possessing the victim's images; (2) the number of future offenders likely to be caught and convicted; (3) whether the defendant had any role in the initial production of the images; (4) whether the defendant reproduced or distributed the images; (5) how many images the defendant possessed; and (6) "other facts relevant to the defendant's relative causal role." *Id*. at 460-61. "These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders. They should rather serve as rough guideposts for determining an amount that fits the offense." *Id*.

While *Paroline* involved mandatory restitution under § 2259 – rather than § 2429 which governs the offense of conviction for this defendant– the principles set out in *Paroline* provide guidance to the Court in determining a fair amount of restitution. First, there can be no doubt that Minor Victim 1 was harmed by this defendant's actions. Second, the defendant, by sexually abusing the little girl, was a proximate cause of this harm. Finally, in fashioning a restitution award, this Court should consider that the government is aware of 4 individuals who sexually abused Minor Victim 1. This includes, as detailed above, her own mother, as well as two other offenders. The government does not believe there will be other hands-on offenders caught and convicted in these matters. To date, while Minor Victim 1's images have been reported to the National Center for Missing and Exploited Children, the United States is not aware of any cases resulting from that submission. What is clear in this case is that this defendant played a role in the initial production of these images, and by sexually abusing this little girl, he had a direct causal

14

role in the harm that she has and will suffer. For all these reasons, a restitution award of $100,000, in light of the total expected lifetime losses of $1,406,380, is appropriate.

### IV.     Conclusion

The Government submits that a Guidelines sentence of 168 months, followed by a term of lifetime supervised release, is a reasonable sentence in this case and is "sufficient, but not greater than necessary to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


_____/s/_____
Amy E. Larson
Jocelyn P. Bond
Assistant United States Attorneys